IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| MARTIN RENNER BRYAN and | ) Case No. 04-45810 |
| BECKY LEE BRYAN, | ) |
| | ) |
| Debtors. | ) |

MEMORANDUM OPINION

Debtors Martin and Becky Bryan seek to redeem a 2003 Pontiac Bonneville, VIN 1G2HY52K034179942 (the Bonneville), for the sum of $13,400. Bank of America (BOA), the holder of an assigned retail installment agreement dated January 31, 2004, which is secured by the Bonneville, objects to the redemption value. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that trade-in value, as defined by the National Automobile Dealers Association Guide (NADA), is generally the most appropriate starting point for value, and is the applicable value in this case.

FACTUAL BACKGROUND

On September 21, 2004, the Martins filed this Chapter 7 bankruptcy petition. On their statement of intentions they indicated that they intended to redeem the Bonneville for the sum of $13,400. BOA believes the liquidation value of the Bonneville to be at least $18,900.

DISCUSSION

Section 722 of the Bankruptcy Code (the Code) allows debtors to redeem exempt personal property by paying to the secured creditor the amount of the allowed secured claim:

> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.[1]

While section 722 does not set out the valuation standard to be used, it does state that the secured creditor is entitled to an amount equal to the value of the allowed secured claim. The value of an allowed secured claim is determined by section 506(a) of the Code:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.[2]

The United States Supreme Court, relying on the terms "proposed disposition or use," held that the valuation standard to be used in Chapter 13 is replacement value.[3] The Court went on to define replacement value as "the price a willing buyer in the debtor's trade, business or

---

[1] 11 U.S.C. § 722.

[2] 11 U.S.C. § 506(a).

[3] *Associates Commercial Corp. v. Rash (In re Rash)*, 520 U.S. 953, 960, 117 S. Ct. 1879, 1879, 138 L. ed. 2d 148 (1997).

situation would pay to obtain like property from a willing seller."[4] The Court explained that a debtor must pay more than liquidation value in order to retain the car because the creditor bears the risk of a future default and future depreciation.[5] The Court made clear that this value is applicable because a debtor chooses to exercise the section 1325(a)(5)(B) cram down.[6] It is not necessarily the value to be used when a debtor wishes to redeem a car. In fact, almost every court that has considered this issue has declined to apply a replacement value standard to redemption in Chapter 7.[7] Instead, the courts mostly use either liquidation or trade-in value.

There are different accepted approaches for valuing an automobile: (1) retail value – the price a willing buyer is willing to pay for any car; (2) replacement value – the price a willing buyer is willing to pay for a similar car minus the cost of sale; and (3) liquidation value.[8] For the most part, though there are subtle differences, courts use the terms liquidation,

---

[4]*Id.*

[5]*Id.* at 520 U.S. 962-63, 117 S. Ct. 1885-86.

[6]*Id.* at 520 U.S. 965, 117 S. Ct. 1886.

[7]*In re Smith*, 307 B.R. 912, 916 (Bankr. N.D. Ill. 2004) (citing *Triad Financial Corporation v. Weathington (In re Weathington)*, 254 B.R. 895 (B.A.P. 6th Cir. 2000); *In re Tripplett*, 256 B.R. 594 (Bankr. N.D. Ill. 2000); *In re Henderson*, 235 B.R. 425 (Bankr. C.D. Ill. 1999); *In re Donley*, 217 B.R. 1004 (Bankr. S.D. Ohio)). *See also, In re Smith*, 313 B.R. 785 (Bankr. N.D. Ind. 2004); *In re Bouzek*, 311 B.R. 239 (Bankr. E.D. Wis. 2004); *Smith v. Household Automotive Finance Corporation (In re Smith)*, 313 B.R. 267 (N.D. Ill. 2004); *In re Podnar*, 307 B.R. 667 (Bankr. W.D. Mo. 2003); *In re Gonzalez*, 295 B.R. 584 (Bankr. N.D. Ill. 2003). *Compare with, In re Smith*, 307 B.R. at 921 (where the court determined that a value of 10 percent below established retail value would be allowed absent expert valuation testimony).

[8] *In re Podnar*, 307 B.R. 667, 670 (Bankr. W.D. Mo. 2003).

wholesale, trade-in, and foreclosure value interchangeably.[9] In general the values contained in these terms are defined as either the amount a secured creditor would receive if it repossessed the collateral and sold it in the most beneficial manner it could – foreclosure or liquidation value –[10] or the amount a consumer might expect a dealer to offer when asking the dealer to take a vehicle in trade – trade-in or wholesale value.[11] There is also the concept of "gross sales price" verses "net to seller."[12] The "net to seller" is the amount received at the sale, be it a private sale or an auction, less the costs of sale, which includes the costs of repossession, transportation, storage, and sales commissions.[13] This, of course, is not the situation when a debtor wishes to redeem the car, as there is neither a repossession nor a sale. The trade-in value, on the other hand, is the retail price of the car minus the costs to recondition and repair the car, the interest paid to finance the car until it is sold, the cost of storing the car, and any profit.[14] If a debtor elects to redeem the car, the dealer bears none of the costs to prepare a car for future sale, or any of the risks associated with holding the car for sale. There are, however, some inherent risks in the redemption process.[15] The Code provides a debtor with a

---

[9]*Id.* (citing *Zell v. Chevy chase Bank, FSB (In re Zell)*, 284 B.R. 569, 572 (Bankr. D. Md. 2002)).

[10]*In re Smith*, 313 B.R. 785, 790 (Bankr. N.D. Ind. 2004).

[11]*In re Smith*, 307 B.R. 912, 918(Bankr. N.D. Ill. 2004).

[12]*In re Smith*, 313 B.R. 785, 790 (Bankr. N.D. Ind. 2004).

[13]*Id.*

[14]*In re Smith*, 307 B.R. 912, 916-17 (Bankr. N.D. Ill. 2004).

[15]*In re Smith*, 313 B.R. 785,

minimum of 75 days to pay the secured creditor the full redemption value.[16] The debtor will be in possession of the collateral during this time, subjecting it to both deterioration and damage or loss.[17] Moreover, this court recently held that the appropriate date for valuing collateral a debtor seeks to redeem is the date the motion to redeem is filed or, if contested, the date of the hearing.[18] These risks, nevertheless, are minimal compared to the risk associated with future default and depreciation over the term of a Chapter 13 plan. Based on all these factors, I agree with Judge Venters that the trade-in value most accurately reflects the value to which a secured creditor is entitled when a debtor elects to redeem a car.

There are three accepted publications for determining the trade-in value of used cars: (1) the Black Book; (2) the Kelley Blue Book; and (3) the National Automobile Dealers Association (NADA) Guide.[19] The Black Book places a car of a particular model in one of four categories, based on its condition, and then provides a wholesale price based on the prices dealers pay for cars at auctions.[20] This valuation method is sometimes challenged on the basis that consumers do not have access to these auctions, so they are unable to obtain Black Book prices. The Kelley Blue Book classifies vehicles based on their condition and then gives a

---

[16]*See* 11 U.S.C. § 521(2).

[17]*Id.* at 790-91.

[18]*In re Podnar*, 307 B.R. 667, 673-74 (Bankr. W.D. Mo. 2003) (Venters, J.).

[19]*In re Gonzalez*, 295 B.R. 584, 587 (Bankr. N.D. Ill. 2003).

[20]*Id.*

wholesale price that generally corresponds to the Black Book price.[21]

The NADA guide provides both a retail and a trade-in value for each vehicle. NADA's prices, however, do not vary with the condition of the car, thus, the NADA prices are generally higher than either the Black Book or the Kelley Blue Book.[22] This is an advantage to the consumer that is trading in one car for another.

All three of these publications are easily accessible through Credit Union Direct Lending at www.cudirect.com. In this case the Kelley Blue Book listed a trade-in value for the Bonneville of $14,000. The Black Book listed a trade-in value of $18,500, and the NADA Guide listed a trade-in value of $18,900.[23] In *Podnar* the court determined that, absent other evidence, the NADA Guide's trade-in value, while not an auction or wholesale value, was an accurate measure of liquidation value for redemption purposes.[24] I agree. The NADA Guide, however, which only values cars in good condition, provides a description for the average trade in vehicle as follows:

> An Average Trade-In vehicle should be clean and without glaring defects. Tires and glass should be in good condition. The paint should match and have a good finish. The interior should have wear in relation to the vehicle. Carpet and upholstery should be clean and all power options should work. The milage

---

[21]*Id.*

[22]*Id.*

[23]The NADA Guide found the average trade-in value for a 4-door 2003 Pontiac Bonneville-V6 Sedan SLE to be $16,950. NADA then increased the value as follows: (1) low milage of 14,500 increases the value by $825.00; (2) Leather seats increases the value by $500.00; and (3) a power sunroof increases the value by $625.00. Def. Ex. D.

[24]*In re Podnar*, 307 B.R. 667, 672 (Bankr. W.D. Mo. 2003).

should be within acceptable range for the model year. The "Average Trade-In" value is a national average calculated from the Official Used Car Guide's ten regions. The "Average Trade-In" value for your vehicle could be higher or lower than the national average due to local market conditions.[25]

If evidence is offered that the car in question is not in good condition, or if the car is such that it would have more value in one region of the country than another, then either the Black Book or the Kelley Blue Book values could be relevant. Both of these publications consider the condition of the car and the region in which it is located. Otherwise, I will use as redemption value the NADA Guide's trade-in value. In this case, there is no evidence the car is not in good condition and there are no regional considerations. I will, therefore, enter an order denying the Bryans motion to redeem the Bonneville for the sum of $13,400. If the Bryans wish to redeem the Bonneville, they must pay to Bank of America the sum of $18,900, within 45 days of the date of this Order.

An Order in accordance with this Memorandum Opinion will be entered this date.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: 12/22/2004

Copy to: Dianna Jo Lord
David A. Naatz
David C. Stover

---

[25] Def. Ex. D.